**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA – MIAMI DIVISION**

THE HAITIAN DIASPORA POLITICAL
ACTION COMMITTEE (HDPAC)
NATHANIEL BALLANTYNE
CRIDIKEL TRUTHBAY                              Case No.: _____
RENEE HASLER
JOCELYN JEAN LOUIS
KICWITT CINEUS
MUSCADIN JEAN YVES JASON
ALIX PIERRE
FRANTZ SAINT FORT
ANGE CARMEL MARIE FONTILUS
ERIC PLACIDE
(On behalf of themselves and all other
similarly situated donors and beneficiaries)


                    Plaintiffs

                                              CLASS ACTION COMPLAINT
THE AMERICAN RED CROSS                         FOR ACCOUNTING OF DONATED
THE INTERNATIONAL RED CROSS                    FUNDS AND FOR MONEY DAMAGES
THE HAITIAN RED CROSS,
GAIL J. MCGOVERN, (in her
Official Capacity as Chief Executive           **JURY TRIAL DEMANDED**
Officer (CEO) of the American Red Cross,
CLIFF HOLTZ, (in his capacity as president
and Chief Executive Officer of American Red Cross)
BONNIE MCELVEEN-HUNTER (Individually and
her official capacity as chairwoman of the Board of
directors of the American Red Cross)
THE BOARD OF DIRECTORS OF THE
INTERNATIONAL RED CROSS, in
their capacity as Board Members)
THE BOARD OF DIRECTORS OF THE
AMERICAN RED CROSS (In their official
capacity as members of the board of directors)
THE BOARD OF DIRECTORS OF THE HAITIAN
RED CROSS (In their individual and official
capacity as members of the Board of Directors)
JOHN DOE 1-100 (being subsidiaries,
and/or subcontractors of RED CROSS).

                    Defendants.

1



## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, MORRIS LEGAL PC with offices at 2800 Biscayne Boulevard, Suite 530, Miami, Florida 33137, sue the defendants and allege as follows: This lawsuit is based on investigation by counsel, conversations with dozens of people including discussions with counsel for Defendants.

## PRELIMINARY STATEMENT

Those who intercept the money intended for the poor have been aptly called "poverty pimps."[1]  These individuals and organizations view the poor as commodities.  They exploit the plight of the poor to extract resources from society, claiming to act in their name while serving their own interests.  The poem below, written by Thomas Sowell in 1998, aptly describes such people and organizations:

---

[1]   See *Capital Magazine*, June 11, 2001, "The Poverty Pimp's Poem," available at https://www.capitalismmagazine.com/2001/06/the-poverty-pimps-poem/.

### THE POVERTY PIMPS' POEM

*Let us celebrate the poor,*

*Let us hawk them door to door.*

*There's a market for their pain,*

*Votes and glory and money to gain.*

*Let us celebrate the poor.*

*Their ills, their sins, their faulty diction*

*Flavor our songs and spice our fiction.*

*Their hopes and struggles and agonies*

*Get us grants and consulting fees.*

*Celebrate thugs and clowns,*

*Give their ignorance all renown.*

*Celebrate what holds them down,*

*In our academic gowns.*

*Let us celebrate the poor.*



Thomas Sowell's poem encapsulates how crises are often exploited for self-enrichment, neglecting the needs of those ostensibly being helped. This exploitation mirrors the actions of the defendants in this case, who leveraged the catastrophic 2010 Haiti earthquake,[2] and several

---

[2]   The January 12, 2010 earthquake was a devastating natural disaster that struck the West Indian Island of Hispaniola, which is shared by Haiti and the Dominican Republic. Haiti, occupying the western third of the island, was the most severely affected. While the exact death toll remains uncertain, the Haitian government reported more than 300,000 fatalities, potentially making it one of the deadliest natural disasters in recorded history, though other estimates are lower. Additionally, the nation's infrastructure was devastated, and hundreds of thousands of survivors were displaced and/or left homeless. See *2010 Haiti Earthquake*, Britannica, available at https://www.britannica.com/event/2010-Haiti-earthquake

subsequent earthquakes, and other natural disasters occurring in 2016, 2018, 2021,[3] and 2023,[4] to raise over five-hundred millions of dollars in donations, purportedly for relief efforts in Haiti. Instead, significant portions of these funds were diverted for personal gain and administrative overhead, leaving the intended beneficiaries in Haiti to continue enduring hunger, poverty, and despair.[5]

This class action complaint is filed on behalf of two distinctive classes: (1) **the Class of Beneficiaries**, comprising at least 2 million individuals residing in Haiti and the United States who were personally victimized by the earthquake(s) in Haiti, including those who lost property or loved ones and were intended recipients of over five hundred million dollars raised by the defendants; and (2) **the Class of Donors**, consisting of thousands of individuals in the United States and worldwide who donated over 500 million dollars to the Defendants from 2010 to 2024 specifically to aid earthquake victims in Haiti.

---

[3]   On Aug. 14, 2021, a powerful magnitude 7.2 earthquake struck Haiti. The largest earthquake in the region since 2010, the disaster left at least 2,000 people dead, 12,000 people injured, and nearly 53,000 houses destroyed.  See MIT News, available at https://news.mit.edu/2021/3-questions-camilla-cattania-william-frank-haiti-earthquakes-1006

[4]   In June 2023, Haiti experienced two significant earthquakes: a magnitude 4.4 quake on June 4, followed by a magnitude 5.5 quake on June 6.  These events caused loss of life, widespread property destruction, and the displacement of over 13,000 people.See UN News available at https://news.un.org/en/story/2023/06/1137407

[5]   Why NGO do more Harm than Good to Poor Countries. A study by the Kellogg Foundations: https://insight.kellogg.northwestern.edu/article/international-aid-development-ngos-crowding-out-government.



Days after the 2010 earthquake the named Defendants (collectively referred to as ("Red Cross" or the "Defendants") moved swiftly to create a platform to raise money. In the ensuing days and weeks, the Defendants used pictures of the devastating damage in Port-Au-Prince to raise money from donors all over the world. Within a few weeks the Defendants raised millions of dollars, and in total from the period 2010 through 2024, they raised in excess 500 million dollars. This money was supposed to be spent in Haiti, rebuilding roads, hospitals, schools, and helping victims of the earthquakes. Instead, the defendants misused the funds to pay exorbitant, unjustified salaries to their CEOs and executives, enabling them to live extravagant lifestyles while the intended beneficiaries of the donations suffered from hunger, poverty, and disease. From 2010 to present, the Defendants continued their fraudulent pattern of raising money to help Haiti recover from the multiple earthquakes and other natural disasters under false presentences.

The Plaintiffs consist of individuals who are members of the class of beneficiaries, having directly suffered from the devastation of the 2010 earthquake in Haiti and for whom the Defendants raised funds, as well as members of the class of donors, who contributed money to the Defendants under the belief that their donations would be used for the stated purpose of aiding the victims. Additionally, the organizational Plaintiff represents the interests of all

Haitian Americans who donated to the Red Cross to support the people of Haiti during the period from 2010 through 2024.

Plaintiffs bring this class action lawsuit alleging fraud, unjust enrichment, conversion, theft, embezzlement, intentional misrepresentation, fraudulent conversion, breach of implied covenant of good faith, fair dealing, negligent hiring training and supervision, conspiracy to defraud both the donors and the beneficiaries, intentional infliction of emotional distress, negligent infliction of emotional distress, exemplary punitive damages, fraudulent conversion, injunctive relief, deceptive business practices, and for accounting of the donated funds against the named Defendants.

## POVERTY PIMPS

The Defendants, like many other non-governmental organizations, have for decades exploited the poverty and calamities of impoverished nations and their people to enrich themselves under the guise of humanitarian aid.  While claiming to collect funds to assist those in need, the reality is that hundreds of millions of dollars rarely reach the intended recipients. The Defendants' modus operandi involves targeting marginalized communities and using the images of suffering children and women in their videos, radio advertisements, and commercials to evoke sympathy and incentivize donations.  They assure the public that these contributions will save lives. They did everything with the funds raised but save lives.





Following the 2010 earthquake, the Defendants, through the Red Cross, identified a lucrative opportunity to raise significant funds.  They quickly engaged the people of Haiti, including the Haitian government, with promises of assistance.  The Defendants publicly claimed that the funds would be used to build houses, schools, and hospitals, repair earthquake-damaged roads, provide shelter for earthquake victims, and supply essential medicine, food, and water to the people of Haiti.  However, none of these promises were fulfilled.  The Defendants repeated similar fraudulent practices after subsequent earthquakes, including those in 2021 and 2023.  To this day, the Defendants continue to solicit donations under false pretenses, deceiving the public into believing their contributions will aid the people of Haiti.

The Red Cross is a powerful international non-profit organization with offices worldwide.  The Defendants have leveraged this power and influence to exploit and abuse the trust placed in them by the public.  Haiti is just one of many poor countries the Defendants have routinely exploited for personal gain.  For the Defendants, no calamity or natural disaster is wasted. In the case of Haiti, the 2010, 2021, and 2023 earthquakes, along with other disasters,

served as opportunities for the Defendants to perpetuate their exploitation of the Haitian people and the Plaintiffs, who placed their trust in the Red Cross, hoping the organization would provide relief to those in desperate need.

<u>**NATURE OF CASE**</u>

1.      This class action lawsuit arises from the Defendants' fraudulent actions and their failure to account for over half a billion dollars donated expressly to assist victims of the 2010, 2021, and 2023 earthquakes, as well as other natural disasters that struck Haiti between 2010 and 2024.  Instead of using the funds for their intended purpose, the Defendants misappropriated the money for unrelated purposes.  Following the 2010 earthquake in Haiti, more than five million people worldwide—men, women, and children—generously donated to the Defendants.  The Defendants capitalized on the images of suffering children in Haiti's streets and leveraged the influence of public figures to manipulate and pressure individuals into contributing as much as possible.



2.      Named Plaintiffs and similarly situated individuals donated over $500 million to the Defendants between 2010 and 2024, believing the funds would be used exclusively to assist victims of the Haitian earthquakes.   Defendants repeatedly assured donors that their contributions would directly aid those affected by these disasters.  Fourteen years after the devastating 2010 earthquake, and despite subsequent earthquakes in 2021 and 2023, the people

of Haiti are still awaiting meaningful assistance from the Red Cross and a full accounting of the funds collected.  Despite numerous articles, letters, and requests for transparency sent to Defendants since 2010, the Defendants have refused to publicly disclose how the $500 million was spent.  Instead, they continue to solicit donations under false pretenses.

3.      On January 12, 2010, a magnitude 7.0 earthquake struck southern Haiti, toppling buildings and power lines, resulting in widespread devastation.  Raymond A. Joseph, Haiti's ambassador to the United States, described it as a catastrophic event for the Western Hemisphere's poorest nation.

4.      The U.S. State Department anticipated "serious loss of life," according to spokesperson P.J. Crowley, as reported in Washington, D.C.

5.      On January 13, 2010, following extensive media coverage by CNN highlighting the devastation in Port-au-Prince, the CEO of the American Red Cross, Gail J. McGovern, publicly announced that the organization stood ready to raise funds to assist Haiti in its recovery.

6.      By January 15, 2010, Defendants had mobilized their operations in Haiti, requesting footage of the destruction to use in promotional campaigns.

7.      Shortly thereafter, Red Cross commercials flooded media platforms, urging the public to donate to aid "the poor people of Haiti." Shocked by the scenes of devastation, Americans and others worldwide responded generously, donating substantial sums to the Defendants.

8.      By January 20, 2010, Defendants issued a press release declaring that they had raised $486 million for Haiti relief efforts.

9.      On or about January 13, 2010, the named Plaintiff personally donated hundreds of dollars to the American Red Cross, believing these funds would be used to aid earthquake victims.

10.     Over the past 14 years, Defendants have issued numerous misleading reports and communications falsely claiming that the funds were used to build hospitals and rebuild homes in Haiti. These statements are demonstrably false.

11.     Despite their fraudulent actions and omissions, Defendants continue to assure the public that donations have supported earthquake victims, while knowingly using the funds for unrelated purposes.

12.     For example, Defendants allocated $150 million of the donated funds to cover the Red Cross's financial deficit and used the remaining $400 million for unrelated projects. Nevertheless, Defendants persistently misrepresented, via email, U.S. mail, and the Internet, that these funds were used for recovery efforts in Haiti.

13.     Defendants engaged in fraudulent concealment to obscure their initial fraudulent activities and perpetuate their scheme.   These actions misled donors, who continued contributing based on false assurances that their donations would aid the people of Haiti.

14.     The 2010 earthquake became a windfall for Defendants, as the Red Cross faced internal financial challenges, including a $150 million deficit and prior scandals tied to its 9/11 and Hurricane Katrina responses.  Gail J. McGovern, then CEO, capitalized on the Haiti disaster as a "spectacular fundraising opportunity," as described by a former official involved in the effort.

15.     Prominent figures such as Michelle Obama, the NFL, and celebrities joined appeals for donations, further amplifying the fundraising campaign.

16.     Unlike other organizations such as Doctors Without Borders, which ceased fundraising for Haiti once sufficient funds were secured, the Defendants continued soliciting donations. These funds were then misused, including to erase the Red Cross's $150 million deficit.

17.     Ultimately, the Red Cross raised more funds for purported aid to Haiti than any other charity.  However, the Red Cross failed to deliver on its promises, and both the people of Haiti and donors are still waiting for meaningful results.

18.     In 2011, the Red Cross announced various projects that were never completed, despite claims that funds had been appropriated for them.

19.     In January 2011, McGovern announced a $30 million partnership with USAID to build roads and infrastructure for housing projects.  However, it took until August 2013 to finalize an agreement for a single site, which was eventually abandoned due to a land dispute.

20.     A Government Accountability Office report identified severe delays in the Red Cross's Haiti program due to challenges such as securing land titles and leadership turnover.  While other organizations overcame similar challenges to construct 9,000 homes, the Red Cross built only six, despite raising nearly $1 billion.

21.     When questioned about their housing efforts, Defendants cited changing conditions as the reason for failing to deliver on their promises.  An internal email from McGovern in 2013 suggested using remaining funds for unrelated projects such as a hospital, reflecting the lack of a coherent plan.

22.     Internal evaluations revealed that many Red Cross initiatives, such as sanitation and water access projects, failed to deliver tangible benefits to Haitian communities, further highlighting their inefficiency and mismanagement.

23.     From 2010 to the present, Defendants have continued to solicit funds under false pretenses, raising close to $1 billion in the name of Haiti, while providing little to no evidence of the funds being used to assist its people.  Defendants repeatedly misled the public, claiming the funds were spent on earthquake recovery, while diverting them to unrelated purposes and administrative costs.

11

24.     Despite collecting nearly a billion dollars for Haiti, Defendants have consistently failed to provide transparent accounting for these funds. Instead, internal documents and reports reveal that much of the money was used for administrative overhead, expatriate salaries, and projects unrelated to Haiti.  For example, internal Red Cross budgeting documents show that expatriate project managers received extensive allowances and benefits, including housing, travel, and relocation expenses totaling over $140,000 annually, while senior Haitian engineers were paid just only $42,000.

25.     Defendants' reliance on expatriate staff who lacked cultural knowledge, language skills, and local expertise further exacerbated the inefficiency of their programs.  Many expatriates failed to attend critical meetings with Haitian community leaders, rendering the initiatives ineffective and alienating local stakeholders.

26.     Projects intended to improve living conditions in Haiti, such as road rehabilitation and sanitation infrastructure, were either severely delayed or never implemented.  For instance, a $13 million project aimed at improving access to clean water and sanitation faltered due to mismanagement, leaving communities without the promised benefits.  Instead, Defendants resorted to hand-washing education campaigns, which were criticized as ineffective in the absence of access to water and soap.

27.     During a cholera epidemic that claimed over 6,000 lives by late 2011, Defendants' response was plagued by delays and mismanagement.  Plans to distribute soap and oral rehydration salts were poorly executed, and internal documents described the efforts as "very behind schedule."  Haitian officials and aid workers criticized the Red Cross's response, stating that early intervention could have prevented many deaths.

28.     Defendants continued fundraising campaigns under the pretense of aiding Haiti not only misled donors but also diverted funds from other organizations capable of delivering effective relief.  While some NGOs encountered challenges in Haiti, they managed to achieve

tangible results, unlike the Red Cross, which failed to deliver on its commitments despite having unprecedented financial resources.

29.     By prioritizing publicity and internal financial recovery over effective aid delivery, Defendants systematically betrayed the trust of donors and the Haitian people.  Internal discussions within the organization often focused on projects that would generate positive publicity rather than those that would have the greatest impact on Haiti's recovery.

30.     The Defendants' fraudulent misrepresentations and concealment spanned over a decade, enabling them to perpetuate their scheme and continue raising funds under false pretenses.  Publicly, Defendants claimed to have spent $486 million on Haiti, yet they failed to provide any verifiable evidence of such expenditures.  Instead, the only documented financial benefits appear to have been increased compensation for Red Cross executives in both the United States and Haiti.

31.     From 2010 to 2024, Defendants have exploited the goodwill of donors by raising significant funds purportedly for Haiti.  Despite these efforts, they failed to fulfill their promises of building homes, schools, hospitals, and infrastructure or providing essential services such as clean water and medical care.  The Defendants' actions amount to a deliberate and ongoing fraud against donors and the Haitian people.

32.     This systemic fraud has caused significant harm to Plaintiffs and the Class, who donated in good faith with the understanding that their contributions would directly benefit the victims of the Haiti earthquakes and natural disasters.  Plaintiffs relied on Defendants' assurances and have suffered damages due to Defendants' failure to use the funds as promised.

33.     Defendants' conduct demonstrates a reckless disregard for the lives and welfare of those they claimed to serve, as well as for the trust placed in them by millions of donors worldwide.  Plaintiffs seek accountability, damages, and an end to Defendants' fraudulent practices to prevent further exploitation of vulnerable communities and unsuspecting donors.

## JURISDICTION AND VENUE

37.     This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C

§ 1331. This court has jurisdiction over the Plaintiffs' related state and common law claims

pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.  Venue is proper in this

District pursuant to 28 U.S.C. §1391(b)(2).

## THE PARTIES

### The Plaintiffs

38.     Plaintiff Nathaniel Ballantyne is a resident of the State of Washington and a citizen of

the United States.  In or around January 2010, 2011, 2012, 2021, 2023 Nathaniel donated

money to the Defendants, relying on their promise that the funds would be used specifically to

aid victims of the 2010 Haiti earthquake and, more broadly, to assist the Haitian people.

39.     Plaintiff Renee Hasler is a resident of Washington State.  Between 2010 and 2023,

Plaintiff donated several hundred dollars to the Defendants, believing the funds would be used

to help Haiti's recovery efforts in the aftermath of the 2010 earthquake.

40.     The Haitian Diaspora Political Action Committee (HDPAC) is a 527 political

organization registered in the State of Washington with thousands of members of Haitian

descent residing in the United States.  Members of HDPAC, including named Plaintiffs,

contributed hundreds of thousands of dollars to the Defendants.  The organization represents

the collective interests of its members.

41.     Plaintiff Darlene Pierre Licin is a resident of New York City, New York.  Between 2010

and 2024, Plaintiff donated money to the Defendants under the belief that her contributions

would be used to assist the people of Haiti.

42.     Plaintiff Critikel Truthbey is a resident of California.  Between 2010 and 2024, Plaintiff

donated thousands of dollars to the Defendants.  Additionally, during this period, Plaintiff

raised tens of thousands of dollars on behalf of the Defendants for Haiti relief efforts.  However,

none of the funds reached Haiti; instead, the Defendants diverted the money for unrelated purposes.

43.     Plaintiff Muscadin Jean Yves Jason is a resident of Miami, Florida, and served as the mayor of Port-au-Prince from 2007 to 2012.  As mayor, he witnessed first hand the devastation caused by the 2010 Haiti earthquake and worked directly with victims in his city.  Muscadin represents the class of intended beneficiaries of the funds raised and mismanaged by the Defendants.

44.     Plaintiff Alix Pierre is a resident of Port-au-Prince, Haiti.  As a victim of the earthquakes in Haiti, Plaintiff suffered loss of property and/or loved ones and is an intended recipient of the more than $500 million raised by the Defendants for earthquake relief.

45.     Plaintiff Frantz Saint Fort is a resident of Port-au-Prince, Haiti. As a victim of the earthquakes, Plaintiff suffered loss of property and/or loved ones and is an intended recipient of the over $500 million raised by the Defendants for relief efforts.

46.     Plaintiff Ange Carmel Marie Fontilus is a resident of Port-au-Prince, Haiti.  Plaintiff suffered loss of property and/or loved ones as a result of the earthquakes and is an intended recipient of the over $500 million raised by the Defendants.

47.     Plaintiff Eric Placide is a resident of Peggy Ville, Haiti.  As a victim of the earthquakes, Plaintiff suffered loss of property and/or loved ones and is an intended recipient of the over $500 million raised by the Defendants for Haiti earthquake relief efforts.

**The Defendants**

48.     Defendant, the American Red Cross hereinafter ("ARC"), is an American non-profit organization incorporated in the State of Delaware since 1881.  The corporate Defendant has its principal headquarters at 430 17th Street, NW Washington, DC.

49.     Defendant Gail J. McGovern is the Chief Executive of ARC and has served in that position since 2009. This defendant has overseen the Haiti earthquake fund raising project.

Under her leadership, ARR raised over half a billion dollar, and diverted the money to other projects other than the Haiti earthquake recovery project as promised.

50.     Defendant Cliff Holz, serves as the president and chief executive officer of the American Red Cross, in charge of leading emergency responses such as the one in Haiti from 2010 to 2024.

51.     The International Committee of the Red Cross is a humanitarian organization based in Geneva, Switzerland, and in charge of the developing rules and procedures for emergency responses to natural disasters. The organization was founded in 1863.

52.     The Haitian Red Cross is part and parcel of the American Red Cross, and most of its work is done through the American Red Cross.

53.     Bonnie McElveen-Hunter is the Chairwoman of the Board of Directors of the American Red Cross in charge of policy and procedures for the American Red Cross, and this defendant had been intimately involved in approving the expenditures.

54.     The Board of Directors of the American Red Cross compose of between 12 and 20 members responsible for governing and overseeing the organization's management. The board is made up of volunteers, and membership requirements are similar to those of corporate boards. The Governance and Board Development Committee recommends members to the full board, and delegates from chapters and blood services regions approve the final selection at the annual meeting.

55.     The John Does Defendants are subsidiaries and partners of the American Red Cross who participated in the conspiracy to defraud Plaintiffs. The identity of these people are unknown to Plaintiffs at this time.

**ACTUAL ALLEGATIONS COMMON TO ALL OR**
<u>**MULTIPLE COUNTS AGAINST ALL DEFENDANTS**</u>

56.     When the 7.2 earthquake struck Haiti in 2010, the Red Cross, under the leadership of

its Chief Executive Officer Gail J. McGovern, saw an opportunity to leverage the disaster to

raise millions of dollars.  At the time, the organization was grappling with a deficit exceeding

$150 million, which had resulted from years of financial mismanagement.

57.     The Defendants exploited the pain and suffering of Haitian women, children, and men

to solicit millions of dollars under false pretenses.  Fully aware that they had no intention of

using the funds to directly aid Haiti, the Defendants nevertheless misled the public through a

series of public statements, using emotional images, poignant words, and videos depicting the

suffering of Haitians to compel donations.





58.      Beginning on or about January 11, 2010, and continuing to the present day, the Defendants have raised funds under false pretenses.  Rather than being truthful with donors, the Defendants exploited the emotional attachment of donors—particularly Haitian Americans—to Haiti and the plight of its people, using their suffering as a means to solicit donations for purposes unrelated to the promised aid.

59.      Between 2010 and 2024, the Defendants raised nearly $1 billion in donations under the guise of aiding the people of Haiti.  Of this total, $476 million was collected within the first week following the January 15, 2010, earthquake.



60.     From January 2010 to the present, the Defendants continued their fraudulent fundraising practices, claiming the funds would be used for recovery efforts related to the 2010, 2021, and 2023 earthquakes in Haiti.  Of the nearly $1 billion raised on behalf of Haiti, less than 1% was spent on Haiti or its people; over 99% of the funds were diverted to projects entirely unrelated to Haiti, the Haitian Diaspora, or the intended recipients.

61.     Between 2010 and 2024, the Defendants intentionally misappropriated the entirety of the funds collected for Haiti relief efforts.

62.     Over the course of nearly 14 years, the Defendants issued multiple fraudulent and misleading reports and communications claiming, for example, that funds had been used to build hospitals in Haiti—this was false.  They also falsely claimed that funds were used to rebuild homes for earthquake victims, another fabrication.

63.     Despite their fraudulent actions and omissions, the Defendants continue to publicly assert that the money raised was used to assist earthquake victims in Haiti.  In truth, the funds were used for unrelated purposes without the knowledge of the donors.

64.     For example, the Defendants diverted $100 million of the donated funds to cover the Red Cross's organizational deficit.  The remaining $400 million was spent on projects unrelated to Haiti or its people.  Yet, in subsequent communications via email, U.S. mail, and the Internet, the Defendants fraudulently represented that these funds were allocated for recovery efforts in Haiti.

65.     The Defendants engaged in acts of fraudulent concealment, perpetuating a series of affirmative and ongoing misrepresentations.  These actions were designed to obscure the initial fraud, facilitate the continuation of their scheme, and deceive unsuspecting donors, who continued to contribute funds under the belief that their donations would benefit the people of Haiti.

66.     For the past 14 years, the Defendants have knowingly engaged in fraudulent activities while continuing to raise funds under false pretenses.  Whenever a natural disaster struck Haiti between 2010 and 2024, the Defendants capitalized on public emotion by using images and videos of the suffering Haitian people to manipulate members of the Class into donating even more money.





67.     The Defendants had no intention of using the funds they raised to help Haiti.  Instead,

Haiti served as a convenient "poverty basket," enabling the Defendants to profit from each

successive natural disaster.  The more calamities that struck Haiti, the more money the

Defendants collected—entirely under false pretenses and through deceptive public narratives.

68.     Between 2010 and 2024, the Defendants actively prepared for disasters in Haiti, not

with the intention of providing genuine aid to victims, but to exploit their suffering and

misfortune.  These preparations were focused on leveraging the devastation to manipulate

donors into contributing more money.  This pattern reflects the *modus operandi* of the Red

Cross and similar non-governmental organizations, which capitalize on human suffering to

enrich themselves.[6]

---

[6]   There have been many studies conducted showing that NGO and nonprofit organizations
who claimed to work for the poor often hurts the poor in order to maintain their
organizations.   https://nebraskapublicmedia.org/en/news/news-articles/study-questions-
whether-nonprofits-hurt-poor-communities/



## **CLASS ACTION ALLEGATIONS**

69.     For the purposes of the relief sought in this action, Plaintiffs, as representatives of a Class comprising over one million donors and/or intended beneficiaries of the donated funds, bring this case pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated.

70.     Each of the named class representatives was either misled into donating money to the Defendants under false pretenses or was a victim of the Haiti earthquake(s) and an intended beneficiary of the over $500 million raised by the Defendants.  Accordingly, each is a member of the proposed Class.

71.     The Class Plaintiffs seek to represent consists of two distinct subclasses: (a) the Class of Beneficiaries, including at least two million individuals in Haiti and the United States who were personally impacted by the earthquake(s), such as those who lost property or loved ones and were intended recipients of the funds raised by the Defendants.

(b) the Class of Donors, comprising thousands of individuals in the United States and worldwide who donated over $500 million to the Defendants between 2010 and 2024, specifically for relief and recovery efforts in Haiti.

72.     The Class of Donors includes all individuals who contributed funds to the Red Cross between 2010 and 2024 in connection with Haiti and the recovery efforts following the Haiti earthquake(s).

73.     The Class of Beneficiaries includes all individuals affected by the Haiti earthquake(s), including those who lost property or family members and were intended recipients of the over $500 million raised by the Defendants.

74.     The Class of Donors spans at least a dozen countries and is too numerous for practicable joinder.  Similarly, the Class of Beneficiaries includes thousands of individuals in Haiti and the United States, making joinder impractical.

75.     Common questions of law and fact apply to all members of the Class and predominate over any individual issues.   These common questions include the Defendants' alleged fraudulent practices, and the misuse of funds intended for Haitian earthquake victims.  All Class members have been directly affected by the Defendants' actions, resulting in millions of dollars in damages.

76.     The named Plaintiffs will adequately represent the Class and have retained experienced and competent counsel skilled in class action litigation.

77.     A class action is the superior method for the fair and efficient adjudication of this controversy. Managing this case as a class action will pose no difficulties and will ensure the efficient resolution of all claims.

78.     The conduct described herein demonstrates a systematic, Class-wide pattern of fraudulent behavior by the Defendants.  Through deceptive actions, the Defendants defrauded and misled millions of donors, resulting in substantial harm to both the Class of Donors and

the Class of Beneficiaries.  These actions constitute violations of various federal and state statutes.

79.     The Defendants acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the law in their fraudulent conduct and misuse of donated funds.

80.     As a result of the Defendants' conduct, members of the Class have suffered intentional infliction of emotional distress, conversion of funds, and significant economic losses.

81.     The Defendants' actions have caused and continue to cause irreparable harm and loss to Class members, including but not limited to economic damages, emotional distress, and mental anguish. For these injuries, the Class seeks compensatory damages, in addition to other appropriate relief.



## CAUSES OF ACTION AND REQUEST FOR RELIEF

### COUNT 1
### Fraud

82.     Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

83.     From January 2010 through June 2024, Defendants represented to members of the Class that the funds solicited through donations would be used to assist the people of Haiti.  These

representations were made through various mediums, including television advertisements featuring video footage of the earthquake devastation in Haiti, specifically designed to evoke sympathy and encourage donations.

84.    During this period, Defendants engaged in fraudulent conduct by knowingly and intentionally misrepresenting that the donated funds would directly benefit the people of Haiti. These representations were false.  Even before the donations were collected, Defendants were aware that the funds would not be used for the purposes promised.

85.    Evidence shows that the day after the earthquake, Defendants convened a meeting to discuss their strategy for leveraging the disaster.  At this meeting, Defendants determined that the crisis in Haiti presented an opportunity to raise significant funds for the organization. Despite publicly stating that the funds would aid the Haitian people, Defendants knew and decided internally that they had no intention of using the donations for the promised purposes.

86.    From January 2010 through June 2024, Defendants held multiple internal meetings concerning the fundraising efforts and the substantial sums collected.   During these discussions, Defendants made calculated decisions to continue misrepresenting their intentions to the public.  Specifically, Defendants falsely promised that the Red Cross would:

- Utilize donated funds exclusively to assist the Haitian people.

- Collaborate with local organizations to identify and address the needs of specific communities.

- Build homes for those displaced by the earthquake and partner with local organizations to achieve this goal.

- Construct schools and assist the Haitian government in disaster recovery efforts.

- Make lasting investments in Haiti's infrastructure.

87.    These representations were knowingly false when made, and Defendants intended for members of the Class to rely on these false promises.  These misrepresentations were part of a

deliberate scheme to defraud donors and induce them to contribute funds and other property to the Defendants.

88.     Contrary to their promises, Defendants intentionally and purposefully failed to invest the donated funds in Haiti as represented, or at all, thereby betraying the trust placed in them by the members of the Class.

89.     Defendants had no intention of using the donated funds as promised, instead diverting the resources for purposes that did not align with the representations made to the Class.

90.     Members of the Class justifiably relied on Defendants' misrepresentations and, based on this reliance, donated, transferred, or transmitted more than $500,000,000.00. to Defendants.

91.     From approximately 2010 through 2024, Defendants engaged in additional fraudulent acts by disseminating false and misleading reports and communications.   These communications falsely claimed that the donated funds were used to assist earthquake victims in Haiti, including building hospitals and rebuilding homes.   Defendants made these representations despite knowing them to be untrue.

92.     For instance, Defendants diverted $100 million of the donated funds to pay off the Red Cross's financial deficit.  Additionally, the remaining $400 million was allocated to projects unrelated to Haiti or its people.  Despite this, Defendants continued to issue fraudulent communications through email, U.S. mail, and the Internet, falsely representing that these funds were used for recovery efforts in Haiti.

93.     Defendants further engaged in acts of fraudulent concealment by perpetuating affirmative and ongoing fraudulent misrepresentations.  These actions were intended to cover up their initial fraudulent activities and to facilitate the continuation of their scheme.  By doing so, Defendants deceived unsuspecting donors, who continued to contribute money based on the belief that their donations would be used to assist the people of Haiti.  These ongoing misrepresentations prevented the Plaintiffs and the Class from discovering the true nature of

the Defendants' fraud until recently as the Defendants' consistent pattern of fraudulent communications actively misled donors and concealed the initial fraud.

94.     As a result of Defendants' conduct, members of the Class have suffered substantial harm.

95.     Defendants deliberate and intentional actions, executed with malice, fraud, and oppression, have caused and will continue to cause damages to the Class in an amount of more than $500,000,000.00. These damages include consequential losses such as attorneys' fees and costs incurred in investigating Defendants' fraudulent conduct and pursuing this action, all of which will be proven at trial.

96.     Defendants acted to further their own private interests with willful, malicious, wanton, and oppressive behavior.  Their conduct demonstrated a conscious and callous disregard for the consequences and a specific intent to harm the Class, warranting an award of punitive or exemplary damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

WHEREFORE, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

**COUNT 2**
**Breach of Implied Contract**

97.     Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

98.     As outlined above, the Defendants solicited and entered into an implied contract with members of the Class, whereby donors agreed to contribute funds to the Defendants for the sole purpose of assisting Haiti and its people.

99.     Between 2010 and 2024, members of the Class collectively donated over half a billion dollars to the Defendants with the explicit understanding that these funds would be used exclusively for Haiti's recovery and relief efforts.

100.    The Defendants breached this implied contract by collecting the funds under false pretenses and, instead of using the money for its promised purpose, diverting it for unrelated uses contrary to the donors' expectations.

101.    The Defendants were able to collect hundreds of millions of dollars specifically because they assured donors and members of the Class that their contributions would directly help alleviate the suffering of the Haitian people.

102.    In soliciting these funds, the Defendants exploited donors' emotions by using images and videos of suffering Haitian women and children to evoke sympathy and coerce donations.

103.    Members of the Class fully entrusted, paid, transmitted, turned over, and/or wired no less than half a billion dollars to the Defendants, in good faith reliance on the implied contract that the funds would be used to assist the people of Haiti.  Members of the Class fully performed their obligations under the terms of this implied contract.

104.    The Defendants materially breached the express and implied terms of the contract by failing to allocate the collected funds for the promised purposes.  For example, Defendants misappropriated over $100 million to pay down prior debts resulting from mismanagement.

105.    Additionally, the Defendants breached their contract with the Class in other material ways, including but not limited to committing acts of fraud, deception, and embezzlement.  The Defendants exploited the donated funds for their own benefit, diverting opportunities and resources intended for Haiti and its people.

106.    The Defendants concealed their breach of contract by repeatedly and continuously disseminated fraudulent communications via email, U.S. mail, and the Internet, falsely

asserting that the funds had been allocated to recovery efforts in Haiti. These misrepresentations were part of an ongoing effort to mislead donors and avoid detection.

107.    The Defendants' fraudulent acts and concealment constitute a continuous breach of their contractual obligations.  These ongoing misrepresentations prevented the Plaintiffs and the Class from discovering the true nature of the Defendants' misconduct until recently, as the Defendants' consistent pattern of fraudulent communications actively misled donors and concealed the breach of contract.

108.    As a direct and proximate result of the Defendants' breaches, members of the Class have suffered substantial damages amounting to no less than $500,000,000.00.  These damages will be established and proven at trial.

109.    Plaintiffs have also suffered additional damages, including lost profits on their contributions, as well as attorneys' fees and costs, all of which are a direct and foreseeable consequence of the Defendants' actions.

        **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages for Defendants' breach of contract, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 3
## Breach of Implied Covenant of Good Faith and Fair Dealing

110.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

111.    The implied contract referenced above inherently includes a covenant of good faith and fair dealing, as is the case with all contracts.

112.    This implied covenant obligates both parties to act in good faith and fair dealing in their performance of and rights under the contract.

113.     Through the conduct described herein, the Defendants denied members of the Class the benefit of the bargain that was intended and established under the implied contract.

114.     By their actions, the Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing by failing to honor the terms and purpose of the implied contract.

115.     The Defendants concealed their breach of the implied covenant by continuously disseminating fraudulent communications through email, U.S. mail, and the Internet.  These communications falsely asserted that the funds had been used for recovery efforts in Haiti. Such misrepresentations were part of an ongoing strategy to mislead donors and obscure the Defendants' breaches.

116.     The Defendants' acts of fraud and concealment constitute a continuous and ongoing breach of the implied covenant of good faith and fair dealing.   These repeated misrepresentations actively misled the Plaintiffs and Class members, preventing them from discovering the Defendants' misconduct until recently.

117.     As a direct and proximate result of the Defendants' breaches of the implied covenant of good faith and fair dealing, members of the Class have suffered and will continue to suffer significant financial harm.  These damages, including consequential damages and other losses, are not less than $500,000,000.00, with the exact amount to be proven at trial.

118.     Plaintiffs have also suffered additional damage as a foreseeable consequence of the Defendants' conduct, including lost profits on their contributions, as well as attorneys' fees and costs incurred in addressing and uncovering the Defendants' violations.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages for Defendants' breach of implied covenant of good faith and fair dealing, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum

amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 4
### Unjust Enrichment

119.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

120.    At Defendants' request, and in reliance on their promises to help the people of Haiti, members of the class have donated millions of dollars to the Defendants.

121.    The Defendant received over half a billion dollars in donated fund between 2010 and 2014 and another 50 million dollars between 2014 and 2024.

122.    The Defendants promised the donors that the money would be used to benefit the people of Haiti.  However, Defendants had no intention of using the money for the intended purpose - - that (i) the money would be used to help the victims of the earthquake by using the money to build houses, schools (ii) to rebuild roads and other infrastructures that were destroyed as a result of the earthquake, and based on these promises the members of the Class entrusted, paid, transmitted, turned over and/or wire not less than four hundred and eighty seven millions dollars to the Defendants.

123.    Only a negligible portion of the donated funds provided were actually used in Hati between 2010 and 2024, the vast majority of the donated funds were stolen or converted by the Defendants for the Defendants' own benefit to the great detriment of the members of the Class.

124.    Defendants failed to use the vast portion of the donated funds provided to them by the members of the Class as set forth above.  The members of the Class would not have donated the money if they knew that Defendants had no intention of using the fund as promised.

125.    Defendants received and retained the benefit of the Plaintiffs' performance, including their money and property, in direct violation of Defendants' obligations to the Plaintiffs and without performing in accordance with the Defendants' promises and pretenses.

126.    The Defendants concealed their unjust enrichment by continuously disseminating fraudulent communications through email, U.S. mail, and the Internet.  These communications falsely asserted that the funds had been used for recovery efforts in Haiti.  Such misrepresentations were part of an ongoing strategy to mislead donors and obscure the Defendants' breaches.  These repeated misrepresentations actively misled the Plaintiffs and Class members, preventing them from discovering the Defendants' misconduct until recently.

127.    Defendants must be required to return to the members of the Class all of their money Defendants wrongfully retained.

128.    Defendants have been unjustly enriched, and the Plaintiffs are entitled to be compensated for the benefit they have conferred on the Defendants.

129.    The value of the money and property unjustly retained by Defendants is in excess of half a billion dollars, the exact amount of which will be proven at trial.

130.    The Plaintiffs have also suffered additional damages in the form of lost profits on their investment and attorneys' fees and costs as a proximate and foreseeable result of Defendants' conduct.

    **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages for the money and property unjustly retained by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.


### COUNT 5
### Conversion / Theft / Embezzlement

131.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

132.    The Defendants received the above-referenced donated funds from the members of the Class, to be invested in accordance with the Defendants' promises and representations.

133.    The Defendants failed to invest the donated funds as promised and have refused to return the funds to the members of the Class despite multiple demands.

134.    Instead, the Defendants knowingly misappropriated the Plaintiffs' funds, using or attempting to use the property with the intent to permanently appropriate it for their own benefit.  This was achieved through fraudulent and deceitful practices.

135.    To conceal their acts of conversion, theft, and embezzlement, the Defendants disseminated fraudulent communications via email, U.S. mail, and the Internet.  These communications falsely claimed that the funds had been used for recovery efforts in Haiti. These deliberate misrepresentations were part of a sustained effort to mislead donors and obscure their misconduct.  As a result, the Plaintiffs and Class members were actively deceived and prevented from discovering the Defendants' wrongdoing until recently.

136.    As a direct and proximate result of the Defendants' theft, conversion, and/or embezzlement of the Plaintiffs' funds, the Plaintiffs have suffered significant damages of at least $500 million, in addition to consequential damages, including but not limited to attorneys' fees and costs incurred in investigating the Defendants' fraud and pursuing this action.

137.    The Defendants' actions were willful, egregious, and undertaken with reckless disregard for the Plaintiffs' rights.  This conduct warrants the imposition of punitive or exemplary damages in an amount sufficient to punish the Defendants and deter similar misconduct by others.

   **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages for the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest

in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 6
### Intentional Misrepresentation

138.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

139.    The Defendants failed to perform as promised and, at all times, had no intention of fulfilling their commitments.

140.    The Defendants acted with the intent to enrich themselves at the expense of the members of the Class by defrauding them with false claims, including that: (i) the money collected will be used to help the people of Haiti;  (ii) the money will be utilized exclusively for Haiti to build houses and schools; (iii) Red Cross will be working with the Haitian government in the recovery process to identify where the money would be most useful; (iv) Red Cross will work with the Clinton Foundation and local organizations to make sure that the people of Haiti receive aids.

141.    The Defendants made these false promises and representations with the intent to deceive donors, including members of the Class, and induced them to contribute funds that the Defendants knew would not be used for the stated purposes.

142.    Relying on these misrepresentations, members of the Class reasonably entrusted, paid, transmitted, turned over, and/or wired no less than $500,000,000 to the Defendants.

143.    The reliance of Class members on the Defendants' promises was reasonable and directly contributed to the harm they sustained.

144.    To conceal their initial misrepresentations, the Defendants issued fraudulent communications through email, U.S. mail, and the Internet.  These communications falsely claimed that the funds had been used for recovery efforts in Haiti.  These deliberate misrepresentations were part of a sustained effort to mislead donors and conceal their

34

wrongdoing, thereby preventing Plaintiffs and Class members from discovering the truth until recently.

145.    The Defendants failed to use the collected funds as promised and have refused to return the funds to the members of the Class, despite repeated demands.

146.    Instead, the Defendants knowingly misappropriated the Plaintiffs' property, using or attempting to use the collected funds with the intent to permanently appropriate them for their own benefit through fraud, deceit, and misrepresentation, rather than for the purposes they had promised.

147.    As a direct result of the Defendants' intentional misrepresentations and fraudulent conduct, members of the Class have suffered damages amounting to at least $500,000,000, in addition to consequential damages, including but not limited to attorneys' fees and costs incurred in investigating and pursuing this action.

148. The Defendants' actions were willful, intentional, malicious, and fraudulent, warranting an award of exemplary or punitive damages.  Such damages are necessary to punish the Defendants for their misconduct and to deter others from engaging in similar wrongdoing.

        **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.


## COUNT 7
## Civil Conspiracy

149.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

150.    Upon information and belief, the Defendants conspired, combined, and acted with a unified plan and purpose to defraud and embezzle funds from the members of the Class.  They

converted the Plaintiffs' property for their own use and benefit by engaging in the unlawful acts described herein.

151.    Upon information and belief, the Defendants conspired, combined, and acted with a shared intent to breach their fiduciary and common law duties owed to the members of the Class by carrying out the unlawful acts outlined above.

152.    At all relevant times, the Defendants committed overt acts in furtherance of their conspiracy, including but not limited to devising and executing a scheme to defraud members of the Class into donating millions of dollars.   The Defendants then misappropriated and embezzled these funds for their own benefit, as part of the common plan and purpose described.

153.    To conceal their conspiracy and misconduct, the Defendants disseminated fraudulent communications through email, U.S. mail, and the Internet.   These communications falsely represented that the funds were being used for recovery efforts in Haiti.   These deliberate misrepresentations were part of a sustained effort to mislead donors and obscure their wrongdoing, preventing Plaintiffs and Class members from uncovering the truth until recently.

154.    As a direct and proximate result of the Defendants' actions in furtherance of the conspiracy, the members of the Class have suffered significant damages, including harm to their property and economic interests.   Plaintiffs have incurred monetary losses totaling no less than $500,000,000, with the exact amount to be proven at trial.   These injuries continue to cause harm to Plaintiffs and Class members.

155.    The Defendants' conduct was willful, malicious, wanton, and oppressive, demonstrating a conscious and reckless disregard for the rights of the Plaintiffs.   This egregious misconduct was carried out with specific intent to harm the Plaintiffs, warranting an award of exemplary or punitive damages.   Such damages should be sufficient to punish the Defendants and deter others from engaging in similar misconduct, with the precise amount to be determined at trial.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' compensatory damages, treble damages, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

### COUNT 8
### Negligent Hiring, Training and Supervision

156.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

157.    The Board of Directors of the Red Cross has an affirmative duty to oversee, train, and supervise its executive committee, including the Chief Executive Officer, as well as all employees.    This duty includes preventing employees from engaging in fraud, misrepresentation, theft, or other unlawful conduct that harms the public and individual donors, including members of the Class.

158.    The employees of the Red Cross who participated in misleading the public and committing fraud were hired under the authority of the Red Cross and its Board of Directors.

159.    Between 2010 and 2024, these employees solicited and collected funds from members of the Class under false pretenses, committing fraud by misrepresenting the intended purpose and use of the donations.

160.  During this time, they also disseminated fraudulent communications through email, U.S. mail, and the Internet.  These communications falsely represented that the funds were being used for recovery efforts in Haiti.  These deliberate misrepresentations were part of a sustained effort to mislead donors and obscure their wrongdoing, preventing Plaintiffs and Class members from uncovering the truth until recently.

161.    Defendant Red Cross and its Board of Directors owed an affirmative duty of care to Plaintiffs and members of the Class. Defendants breached this duty by failing to adequately train and supervise their employees, thereby enabling them to engage in fraudulent actions.

162.    The Defendants negligently and/or recklessly failed to meet their duty of care in the hiring, supervision, training, and retention of their employees.  As a result, Red Cross employees engaged in fraudulent and illegal conduct, causing harm and damages to members of the Class.

163.    The Defendants knew or reasonably should have known that their employees were engaging in fraudulent activities targeting members of the Class and the public at large.

164.    Defendants Red Cross, its Board of Directors, and its CEO knew or should have known that certain individuals under their employment were engaging in fraudulent schemes, enriching themselves at the expense of Class members, who suffered significant economic harm as a result.

165.    As a direct result of the Defendants' negligence, Plaintiffs and members of the Class have suffered and continue to suffer economic damages and other injuries.

166.    Defendants are especially liable to all members of the Class due to their negligence in failing to prevent fraudulent conduct perpetrated by their employees and executives.

        **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages caused to them by the Defendants' negligent hiring, training and supervision, including the money and property unjustly stolen, converted and/or embezzled by the Defendants, lost profits on their investment, reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 9
### Intentional Infliction of Emotional Distress

167.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

168.    Defendants' actions toward the Plaintiffs and other members of the Class constituted extreme and outrageous conduct and was done intentionally.

169.    Defendants fraudulently coerced members of the class to donate money with a false promise of using the money to prevent more suffering in Haiti.

170.    Defendants' extreme and outrageous conduct subjected the class members to emotional trauma, humiliation, severe emotional distress.

171.    Defendants' actions and the ensuing damage to class members were foreseeable. Upon information and belief some class members have been very distraught by the actions of the RED CROSS.

172.    As a result of Defendants' intentional actions, the Plaintiffs sustained injuries and damages for which each Defendant is individually and severally liable to Plaintiffs.

**WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages caused to them by the Defendant's intentional infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 10
### Negligent Infliction of Emotional Distress

173.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

174.    Plaintiffs owe a duty of care to the members of the class, that duty is an affirmative duty to tell the truth with regard to the nature of the donors' investment in RED CROSS, and the purpose of the collections.

175.   Defendants working together and in concert breach that affirmative duty by repeatedly lying to the Plaintiffs and the public in general about how the collected funds will be used and the people who would benefit from natural disaster recovery in Haiti.  These lies were material because without them, members of the class would not have donated as much money as they did.

176.   Plaintiffs sustained emotional and economic damage because of the Defendants' actions. Those damages were foreseeable, and they are the direct result of Defendants' actions.

177.   Defendants' actions are the proximate cause of Plaintiff's injuries, "but for" Defendants 'actions Plaintiff would not have sustained the damages.

178.   Each named Defendant is individually and severally liable to Plaintiffs for all their damage.

   **WHEREFORE**, the Plaintiffs request that the Court enter judgment in favor of them and jointly and severally against the Defendants awarding Plaintiffs' damages caused to them by the Defendant's negligent infliction of emotional distress, including reasonable attorney's fees and costs, pre-judgment and post-judgment interest in the maximum amount allowed by law, and any and all other relief to which Plaintiffs may be entitled at law or in equity.

## COUNT 11
## <u>Exemplary Punitive Damages</u>

179.   Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

180.   Defendants' actions alleged above were malicious, willful and wanton, and were made with specific intent to harm Plaintiffs.

181.   Defendants' actions alleged above violated 18 U.S.C. § 1343.

182.   Defendants' actions alleged above constitute fraud and conspiracy to commit fraud.

183.   In order to deter such conduct in the future, Plaintiff should be awarded exemplary punitive damages in an amount of not less than $50,000,000.

184.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

## COUNT 12
### Statutory Claim for Fraudulent Conveyance

185.     Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

186.     Upon information and belief, Defendants developed and implemented a scheme to transfer assets to each other and others to place them outside of the reach of their creditors, including each member of the Class.

187.     The aforesaid transfers were made with actual intent to hinder, delay, or defraud the members of the Class and without receiving a reasonable equivalent value in exchange for the transfer or obligation.

## COUNT 13
### Injunctive Relief

188.     Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

189.     Unless Defendants are temporarily, preliminarily, and permanently enjoined from improperly and unlawfully depriving the members of the Class of their rights under the above-referenced implied contract, and from transferring assets to each other and others to place them outside of the reach of their creditors, the members of the Class will be immediately and irreparably harmed by present and/or future economic loss, which is presently incalculable.

190.     The members of the Class have no complete or adequate remedy at law.

191.     The members of the Class will suffer greater injury if an injunction is not granted than Defendants will incur if the injunction is granted.

192.     The Public interest will be served by an injunction against Defendants by the enforcement of the requirements of the implied contract.

193.    By virtue of the foregoing, the members of the Class have demonstrated a likelihood of success on the merits and that the balancing of the equities favors issuance of an injunction against Defendants.

**COUNT 14**
**Accounting and Insurance**

194.    Plaintiffs incorporate the allegations of paragraphs 1-64 as if fully realleged herein.

195.    Defendants must account for all transactions regarding their fraudulent scheme, and the 500 million dollars they have collected on behalf of the people of Haiti.

196.    Defendants must also provide the names, policy numbers, and contact information for their insurance companies, including but not limited to policies providing for general liability, professional liability, Board of Directors' liability and errors and omissions, so the members of the Class can submit claims against the Defendants.

197.    The members of the Class demand that Defendants be required to produce a full and complete accounting of all transactions regarding their fraudulent scheme, including, but not limited to, all transfers of funds to accounts and/or third parties wherever they may be, as well as their insurance companies, insurance contact information, policy numbers, and coverage.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable that are raised herein, or which hereinafter may be raised in this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.   Finding that all defendants are jointly and severally liable for all damage caused to Plaintiffs;

2.  Awarding Plaintiffs monetary damages in an amount of between five hundred million and one billion dollars to be proven at trial;

3.  Awarding Plaintiffs its litigation expenses, including reasonable attorneys' fees, costs, and disbursements.

4.  Awarding Plaintiffs punitive damages in the sum of not less than $150,000,000.00  or an amount otherwise to be decided by a jury;

5.  A judgment be entered against Defendants individual and jointly and separately for one billion dollars; and

6.  Granting such other relief as the case may require or as may be deemed proper and equitable.


Miami, Florida
Dated this 25th Day of  November 2024

Respectfully submitted,


*/s/ Wil Morris,*
MORRIS LEGAL, PC

By: Wil Morris Esquire
2800 Biscayne Blvd, Suite 530
Miami, Florida 33137
(P): 305-444-3437
(F): 305-444-3457
Florida Bar No.: 069493